Mr. McKay. Good morning, your honors. May it please the court and also Ms. Poole. This has been a very complex case. We've been working on this for about over a year on the appeal. Anyway, the issues that I have raised, I've tried to raise them as best I could with the most important to the least important. And I wanted to start with the biggest one I thought of this case, which was the jury instruction on the elements of the offense of sex trafficking. And I realize we do not yet have a case right on point on this interstate commerce clause as to whether or not that should be considered an element of the offense where the defendant must have the mens rea. I interrupt you. You mean in this circuit, right? Yes. Where are the other circuits? I believe there was two circuits, if I recall, that have said that the interstate commerce clause is a matter of procedure. So therefore, the defendant does not need the mens rea. However, as I've tried to point out in my briefing, I still believe that the U.S. Supreme Court case governing this issue specifically talks about the mens rea if it precedes the language of the elements of the offense, that that should be controlling and that that is the presumptive way to read the statute. And they do use the word presumptive. This court also from that case en banc issued its decision, the Boogier decision, if I'm saying that properly, also using the word that that's the presumptive way to read the statute. And then this court in a firearm statute that's cited by the appellee talks about the interstate commerce clause, the traveling interstate commerce not applying to the mens rea. But as I've tried to point out in my reply brief as to that case, this court even pointed out that the elements of the offense did not take place after the mens rea, which is, I think, the big distinction here. This particular statute has the word knowingly right at the beginning. And then all of the elements go after the case. So the dash was enacted by Congress, right? The inter-affecting interstate of foreign commerce. And is there another dash or do you know? I do not know. I apologize. We'll look at it. But it just seems that this statute falls squarely within the most recent U.S. Supreme Court case law, which says that's how we should interpret the statute. I also point out this statute requires language that was not used in the jury instruction given to the jury, which was that Mr. Collier would have to know that force, fraud, or coercion would be used to cause these women to do the various sexual acts. This jury instruction said would cause, which I believe is a huge difference in the way the statute says that the jury instruction should have been. And I do believe that to be a constructive amendment of the statute. And this court has said that that's per se reversible. You do have one case I did point out that this court said we're not sure if it should be per se reversible or not. But you do have at least one or two cases saying it is per se reversible. So I guess I would argue that it in the statute versus the jury instruction submitted to the jury that it could make a difference in what the jury is supposed to decide. Both these are plain error, right? Yeah, that's what I would be on. Yes, go ahead. I mean, plain error is the standard of review. Well, and unless I'm confused, and I apologize if I am, but I thought reversible per se was even stronger than plain error, that it's automatically reversible. Now, perhaps I'm automatically irreversible if it's reversible per se. But in any event, I think the statute is clearly different from the jury instruction given to the jury. And I tried to make sort of an example that I could think of. And that is, you know, we know that a gun would cause someone to die, but we don't know whether a gun would be used to cause someone to die, whether it be a homicide or a suicide. And there is a distinct difference between that. So the third issue that I wanted this court to talk about is willful blindness instruction. Now, with the willful blindness instruction, this court seems to say in case after case that if the facts are so clear that either the defendant knew that it happened, or the defendant didn't know that it happened, then we don't need willful blindness. And that the willful blindness instruction is for those situations where it looks like the defendant deliberately ignored what was happening. And it seems to me in this case that the facts as the defendant knew what was happening, and I ask myself, then why are we having a willful blindness instruction? If it is so entirely clear, and if the facts are so clear that the defendant knew that sex trafficking was taking place, then why in the world are we having this willful blindness instruction? Because this court seems to say in case after case that if it's black or white, and there's no gray, we don't need the instruction. So... Counsel, isn't it because he wasn't necessarily in the room at the time, but there was video evidence of him entering the room, as well as evidence of him having hotel card keys? Yes. And there is a lot of evidence of many things going on. That's a very complex case. But I guess to me, when you whittle it all down, even with seeing him go in and out, and the condoms, and everything else, it just seems that either the government's point that he knew is the case, or if you go with Mr. Collier's struggled presentation of what he wanted to do, and what he wanted to try to present to the jury, was that these women signed contracts, and they weren't supposed to have sexual activity, and that was sort of his theme, then it didn't happen. And it just didn't seem like there was any gray, but that was sort of the issue there. If I want to move on to my issue number four, the cross-examination about... Oh, excuse me. Issue number three. I screwed my issues up. My apology. Issue number was the sequestration. Now, I know that only affects one witness and one charge, but it is troubling what happened here. I did find a US Supreme Court case that I cited in my reply brief, where the court did talk about how different it is when a witness has testified, and it's in the middle of their testimony that they're talking to other witnesses, versus when a witness is not in the middle of their testimony. And I think maybe that's the distinction here, is we had a break where the witness then left, and we know from the record, the witness did meet with government officials, and then the witness got back on the stand. Now, I understand the sequestration rule has been expanded by court cases as to what it means, and I almost read a due process argument combined within that as well, because I know even the courts, when they talk about the sequestration rule, they talk about the history, I think, prior to the establishment of the actual rule itself and the rules of evidence. So it just seems to me that this was very troubling that this occurred, and I think it's nearly impossible to ever get a witness to say that they were coerced out in the lobby. I doubt you'd ever get that to actually happen, but I think what was established in this case is it was conceded that she met with these agents, and clearly, just looking at her testimony, there was much more testimony about the things that she was alleging Mr. Collier was doing to her, versus what she testified prior, before the break. So, that's my point on that. I know that only affects one of the convictions, but I thought it was an important point to make. I thought the computer point was a very important point. He had 56,000 documents on the computer, and as you know, originally he was represented by counsel, then he wasn't represented by counsel, and then he was represented by counsel during this trial. Very difficult trial transcript to read, I'm sure, even for the court, but what I think we can see is that his attorney had 56,000 documents on his computer, that Mr. Collier was very in tune with his case and also, you know, participating in the case extensively, and he was when the judge took away the computer and said that he could only view the computer with U.S. Marshals, I think that that really hindered his ability to properly cross-examine, properly prepare. We know that he was not allowed to prepare at night. We know that he was probably, I mean, the record is the record, but it just, I think it seems very clear that he was not allowed much opportunity to... Well, it said in the presence of the marshal. Does it say where that can occur? No. All I saw was in the presence of the marshal. Yeah, and that's all I could glean from the record. I didn't know anything beyond that, but it just seems like he was denied a great right, and the right, I mean, the government says he doesn't have a right to a computer, but he does have a right to his discovery, and he has a right to have his... And they gave him a disc, right, with the stuff on there? Oh, yes, they did, and I think his attorney had it. I think then the judge said that Mr. Collier could have it, but again, not having access to it as you're having witnesses on the stand, as you're going home in the evening preparing for your defense the next day, I thought was a huge problem. So I thought that that was wrong not to allow him to have his discovery present as he was cross-examining witnesses, and as he was going home in the evening preparing for court. So I don't know how you would establish prejudice otherwise. I just, I don't know how I could make more of a record than the record I have on that Again, the government says that I didn't present all the whole statement of what was said when his attorney told the judge that he wasn't feeling, you know, fit for the case, but I mean, if you do read even what the government says, the whole entire, I guess, wouldn't be testimony, but the transcript of what was said by his attorney, it seems pretty clear he said to the court, I don't feel effective for these long trials. Mr. Collier hearing that really kind of, in lack of a better term, freaked out and wanted a different attorney. Judge Erickson did not want to give him an attorney at that point because they were just beginning trial and he didn't want to do that, but it does present a problem where Mr. Collier has heard this information, he would like a different attorney and nothing's done about it other than to just continue on with his current attorney, no continuances granted. I know that's a tough call when you're in trial like that, especially with a very complex case like this, but it did seem to be a very disturbing moment where perhaps something more should have taken place under the circumstances and frankly, just reading the transcript, I wish he would have gotten another attorney because the transcript is as crazy as he's handling this case pro se after getting rid of his attorney after hearing that commentary. I think it made a very difficult trial for everyone at that point, so I'm not sure proceeding to trial versus continuing the trial would have mattered. The next issue I believe I brought up was the prior background of the witness that was testifying and in that particular issue, I do think- Now counsel, what do you do with the Roy case on that issue? And I apologize, but I do not recall the Roy case. Well, it's the one the district court mentioned at trial. Okay. But go ahead. Okay, I do apologize. It just seems to me that if I can get around the Roy case, which I apologize- No, that's okay. Proceed. But if we know the witness has this prior sexual activity where she is on her own- You don't have to apologize too much. It's in your brief. Okay. Go ahead. Okay. Thank you. That's how complex this case is, but anyway, if we know that she's got this predisposition, it just seems to me that that should have been allowed to be presented to the jury because that would have helped them decide whether or not she was predisposed and might have done it without any fraud, force, or coercion from Mr. Collier, which is what the jury needed to find that Mr. Collier used fraud, force, or coercion, or that he knew fraud, force, or coercion was going to be used too. Just quickly going over because I'm going in my rebuttal, the search issue with the phone issue, we have the one Jackson case. Here I cited to the Lara case at the Ninth Circuit. I know the big issue probably for this court maybe will be the inevitable discovery. To me, my only thoughts on that are I know that there's some case law that says that if you haven't been able to get a search warrant and the only reason you got a search warrant for the phone is because of something you knew, it just seems to me that the information to get a search warrant for the phone would have never been known. Maybe they would have got a search warrant for other things, but I don't think it's entirely clear that they would have got a search warrant specifically for the cell phone, and I think that's where I might disagree with the inevitable discovery issue on that. What impact does the fact that Collier was on supervised release at the time have on that issue? Well, and again, the Lara case talks about probation. The government then cites a Johnson case, which talks about parole being a distinction, which that's what the Ninth Circuit said. And then in our court, this court talked about a probation situation, but I think this court was stressing on the defendant's knowledge and being put on notice that his phone or any of those items would be looked into, and I guess where I distinguish this case is that Mr. Collier wasn't necessarily put on notice. He was on the very intensive probation, but if you look at his clause, it didn't mention anything particularly about a phone. I know Judge Erickson thought that a phone could be read into that search clause, but I don't see the reading of a cell phone within that. And just lastly, I'll just quickly, you know, the issue eight is whether or not there's enough evidence for the verdicts. I mean, just let the court decide that. And issue nine, I mean, I think probably where government and I are at a disagreement is he briefly had an attorney. He filed what I would call the affidavit fitting the statute, but supposedly, if you read the statute, his attorney was supposed to say that this was done in good faith. Clearly, that wasn't done. Under the circumstances, was that required? I would say with having an attorney one week versus the next week not, maybe this court could say that it wasn't required and maybe we should have had a different judge for sentencing. Thank you. Thank you, counsel. Ms. Poole? May it please the court, counsel, Mr. McCabe. Your honors, my name is Jennifer Poole and I represent the United States in this case. And I will try to address the defendant's raised here today and I'll try to do so in turn, although I may jump around a bit unless requested otherwise. First, on appeal, Mr. Collier argues for the first time that the district court committed error when it instructed the jury that the government was not required to prove that the mens rea element knowingly extended to the interstate commerce element. Under the plain air standard of review, this court should reject that argument. First, your honors, as Judge Benton recognized, every circuit court that has considered this issue has determined that the knowledge requirement does not extend to the interstate commerce element. Counsel, how many do you believe have decided it? I believe that the second circuit in Corley, the fifth circuit in Myers. So one, two, three, four, five circuits. Thank you very much. That have considered that issue. Counsel, how would you respond to opposing counsel's argument that the U.S. Supreme Court has said that when the word knowingly appears prior to the other elements that it has to be incorporated as a mens rea requirement? Sure. Yes, the court did in fact say that. But the court said ordinarily this is what court should do. This is how court should read it. But the context or background circumstances that may warrant a different reading of the statute. And this very court has said a special circumstance or rather a special context occurs when the interstate commerce element provides a jurisdictional hook. They said that or this court said that in Garcia Hernandez, the 2015 decision where this court refused to extend the knowledge requirement to the interstate nexus element in the firearm statute. The court went on to explain, I think very helpfully, that the interstate commerce and that statute did not distinguish the innocent conduct from the criminal conduct. The court explained that the criminal conduct, the wrongful conduct, was the knowing possession of the distinguishing the innocent conduct from the wrongful conduct is not whether the defendant knew that his using a hotel or posting advertisements on backpage.com affected interstate commerce. Rather, it was his advertising, his maintaining, his recruiting these young women by forced fraud or coercion for the purpose of them engaging in commercial sex act. That's the wrongful conduct. And that's what Congress sought to criminalize, Your Honor. I think it's helpful also to look at the remaining elements of this statute. I think they support the United States government's argument here. For instance, the other elements in the statute, whether the victim or the victim's status as a minor and the use of forced fraud or coercion, those elements do not require actual knowledge. An individual can violate 1591 if he knows or recklessly disregards the fact that the victim is a minor or that forced fraud or coercion will be used to cause that victim to engage in a commercial sex act. Because the statute doesn't require actual knowledge for these essential elements, Your Honors, I would submit that it doesn't make sense that Congress read the statute as requiring knowledge of the Now, I just want to take a moment to briefly talk about a case that the defendant raised in his reply brief. And I think it's important. The defendant raised the USV Lawson case. And in that case, Your Honors, the Fourth Circuit determined that the knowingly term extended to the interstate commerce element in the cockfighting statute set forth at Title VII, Section 2156. And I want to be clear that the United States, this is the only statute that the United States is aware that the courts have applied the mens rea to the interstate commerce element. But this statute, Your Honors, is very unique and very different than 1591 because it has different elements depending on where the criminal conduct occurs. For example, if the cockfighting or game follow fighting happens in a jurisdiction that legalizes cockfighting, then the government is required to prove that the defendant had knowledge that at least one of the birds involved in that cockfighting traveled in interstate commerce. In contrast, if the criminal cockfighting, then the government need only prove that the defendant participated or sponsored the cockfighting incident regardless of whether the birds traveled in interstate commerce. So a very clear, very unambiguous, different treatment of those two different situations, Your Honor. In summary, as to this element, again, no court has determined that the mens rea applies to the United States v. Sawyer. There's nothing in the language of the statute, nothing in the legislative history that would suggest that Congress intended to mitigate a sex trafficker's wrongful conduct simply because he's just not aware of Congress's congressional power to regulate interstate commerce. So based upon all those decisions, based upon the fact that there's no precedence in this court on this very issue, it cannot be said that the district court committed plain error here, Your Honor. Likewise, the district court did not commit error, much less plain error, when it instructed the jury that forced fraud or coercion would cause the victim to engage in a commercial sex act versus will be used to cause the victim to engage in a commercial sex act. I would submit that this is a distinction without a difference because will be used and would cause are both future tenses. And importantly, the lower courts and even the circuit courts, including this court, use those terms interchangeably. Not necessarily when addressing this very issue raised by the defendant, but in the context of other arguments, they're using these terms interchangeably. Now, the defendant, if I understand it correctly, the defendant seems to suggest that would cause carries less certainty, if you will, than will be used to cause. That is, he seems to argue that the defendant, or rather the government, was merely required to show that this was a possibility or this was a hypothetical. Well, could cause and would cause are not equivalent. And the jury instructions very clearly reflect that the government was required to show that the defendant's, Mr. Collier's, use of force and coercion would have the effect of causing the women to engage in commercial sex acts. Moreover, I would submit that this is an even obscure, more esoteric argument, especially as applied in this case, because the United States argued during closing arguments presented overwhelming evidence that the defendant's use of force, his beating the girls, his threatening to beat the girls, his coercion of these girls, did in fact cause them to engage in commercial sex act. So all kinds of evidence that these women, in fact, did engage in commercial sex acts. Counselor, you were trial counsel too? That's correct, Your Honor. Yes, I thought I heard that. Go ahead. Okay. Again, so because the circuits have held that 1591 does not require the government to prove the completion of a commercial sex act, and based upon the arguments just presented, the fact that the lower courts and even the circuit courts have used these terms interchangeably, it cannot be said that the district court committed plain error in this case. I have no doubt in my mind had Judge Erickson been presented with this or obliged here, he would have changed the language, but he wasn't given that opportunity, Your Honor. So it can't be said again that he committed plain error here. Next, the defendant raises the issue of the court's willful blindness instruction. The court did not abuse its discretion in providing a willful blindness instruction, because despite the girls' advertisements on Backpage.com, buying them lingerie, taking them to the hotels, giving them condoms, taking all their money, despite all of that, Your Honors, he claimed that he did not have knowledge that they were engaging in prostitution. It was his belief that they were either doing exotic dances or that they were giving foot massages. That was his business plan, if you will. Now, this was a defense that the defendant, Mr. Collier, engineered very early in this case, even before he was charged. Specifically, the defendant had the women sign contracts wherein they engaged, or excuse me, they agreed not to engage in prostitution. The government's expert witness at trial, a former Minneapolis police officer and currently a special investigator for the BCA, testified that the pimp's use of these contracts is very common. It's a get out of jail, if you will, card. When they get apprehended, they say, listen, I've got this contract here. So this is something the defendant created in anticipation of the defendant also had disclaimers in these advertisements that he posted on backpage.com. Mind you, these ads were posted under the escort section of backpage.com. But despite these disclaimers that this is not for prostitution, everything else about the ad screamed prostitution. The women were wearing lingerie. They were posed in sexually suggestive manners. In many of the cases, the images reflected just the women's breasts or just the women's rear ends. The price of the massages far exceeded what any reputable massage therapist was charging in the marketplace. Then there was also some language in some of the ads. What's your closest case on this point? And I'm just trying to remember your brief. Sure. I would submit it's the United States. Factually, you know. The United States, the Lewis case. And most recently, the Ibarra-Sanchez case that was just issued by this court last week, Your Honors. In the Lewis case, I think it's important to note that this court said even when there's evidence of actual knowledge, the court in the Lewis decision said that a willful blindness instruction is proper if there is sufficient evidence to support an inference of deliberate ignorance. And surely that's what this defendant did. He created all these steps, or rather took all these steps to create plausible deniability, Your Honors. Now, Mr. McCabe says, well, the government had all this evidence of actual knowledge. And I think as His Honor correctly pointed out, we didn't have knowledge that the defendant observed the commercial sex evidence. We didn't have evidence that the defendant told these girls go into the hotel room and perform acts of prostitution. No, what we did have was that defendant was giving them condoms. We did have the defendant telling these women that go in, you got to do what you got to do to get the money, keep the men happy, whatever it takes. And then he took all the money. That's what we had. So based upon the situation in this case, the defendant's defense, the defendant's very specific defense here, and this court's not abused its discretion in providing that instruction in this case, Your Honor. My time is up, so I just want to, or getting closer, I want to make sure that I raise a couple of issues. So I'm going to skip an issue, and I may come back to it, Your Honor. But I want to address this issue of the defendant's computer being seized. I didn't hear Mr. McCabe reference the fact why the computer was seized. First, I want to point out the defendant doesn't have a right to a computer. That was stated by a district court in the Gator decision. It was a district court decision, however. Second, even though a computer was given to the defendant in this case, it was only taken away after he used it inappropriately. He used it to surreptitiously record a witness's testimony, and this fact was brought to the court's attention by the United States Marshal Service. Had he not done that, the defendant would have had the right to keep that computer throughout the trial. I should also mention that this computer was taken from the defendant very late in the proceedings. It was at the very, very end of the government's case in chief. Eighth day of trial, how long was the trial? Three weeks, Your Honor, but it was a very slow trial. So about 15 days of real trial, something in that range. So halfway through. Yes. I would add, I think that it was taken away during the second or the third to the last witness during the government's case in chief, Your Honor. And I'd also point out that Mr. McCabe doesn't really lay out how this affected his cross-examination. He just says that that he was denied due process, Your Honor. But it still remains that he had access to the computer, albeit in the presence of the United States Marshal Service, and he had access to his standby counsel who had all of the discovery. And on top of that, we provided him additional copy of all the discovery, which of course wouldn't have included any of the recordings that he may have made at that point. Had he been instructed specifically not to record? No, he had not, Your Honor. But I want to just lay out some of the things that had happened before that. The court was very concerned about the security of the witnesses in this case. The defendant did contact a victim using his counsel's cell phone during the trial. And that contact was precluded by the court's directive, the court's order that the defendant have no contact with the victims. And this was reoccurring even before the trial started. This was a problem that the defendant was attempting to reach out to individuals. There was also allegations of witness tampering. The United States charged attempted witness tampering in this case because the defendant was reaching out to individuals in Chicago, asking those individuals to come to Fargo for the purpose of trial so that they could spin on the women, or it was our position, intimidate them. Were the convictions on those charges? No, you're not. No, you're not. But there were charges after an indictment? That's correct, Your Honor. I suspect the defendant was acquitted of those charges because we couldn't show that the victims were actually contacted by these individuals from Chicago. But nonetheless, we charged it as an attempt. But I mention all of this because this was all going on. And the defendant was very concerned about the security of the witnesses in this case. So when this happened, yes, the defendant took away his right to the computer, which, as I said, is a right that I don't think he was entitled to. But nonetheless, took it away. But he still had plenty of other material, including additional discovery, including the use of a standby counsel to complete his cross-examination of the two remaining witnesses. So again, it cannot be said that his due process was that he was denied due process. Issue number five. Just briefly, I want to mention that I think that the defendant is cherry-picking the record here. Mr. Kirshner said that he was having trouble hearing the witness, that he missed an objection because, Your Honors, the defendant was talking, was very loudly, had outbursts. And Mr. Kirshner explained that but for those outbursts, I think that he wouldn't have missed it. And the court then instructed the defendant to pass notes rather than talk to him so that Mr. Kirshner could listen to the testimony. So, Your Honors, there is an explanation for Mr. Kirshner's statements about his missing some of the testimony in that case. Just very briefly, unless there are other questions on that issue, I want to also address issue number seven. And that was the motion to suppress, Your Honor. As His Honor pointed out, this is a defendant who was on supervised release, not just any supervised release, but intensive supervised release, which is reserved for offenders. So what does that mean? It means that this defendant can do absolutely nothing without the permission of his probationary officers. Every morning, he has to call in and give them, this is on the record, every morning he has to call in and tell his team of ISR agents where he's going to be. And according to those IRS agents, they testify that every minute needs to be accounted for. Also, he was subject to some very broad conditions of supervision. It authorized for the search of his residence, his vehicle, his person, suspicionless searches. Now, indeed, these conditions did not expressly authorize the search, but neither did they limit those items which could be searched. Now, the Jackson case I would submit, my time is running out, but I would submit that's on point. This court upheld a warrantless search of a supervised releasee, his phone, even though the conditions of release did not expressly include that phone because the court concluded the defendant was on notice. And I would submit the defendant was on notice here, too. Not only was he aware of all the conditions, but his probationary officer, ISR agent, testified at the suppression hearing that when he transported this defendant from the residence in Moorhead, he would have explained these conditions to him and told him, for example, I get to search your phone. I get to search your residence. And I might add that this was on controverted testimony. And there was also a Minnesota Department of Corrections policy that provided that these IRS agents must search the computer and the phone in the event that there's reasonable suspicion that the individuals, these supervised releasees, are violating their conditions of supervised release. I see that my time is up, Your Honors, and if there's no further questions, I will rely on my brief and sit down. Thank you. Thank you, Ms. Poole, for the argument. Mr. McCate. Well, thank you again, Your Honors, and Ms. Poole. Just to answer a couple of the questions that have been raised before, as I look at the statute, there's just the one line, Judge Benton. The dash on either side of it. Just one is not one down below. In response to your Roy question, I found it. And from, I guess, my argument there, Your Honor, on the United States v. Roy case would be that in Roy, this court and the district court found that it wouldn't have been helpful or mattered or changed the decision of the jury by presentation of that evidence. And I would argue in this case, it could have changed the outcome with this particular witness presenting that evidence, if you go with Mr. Collier's theme and theory that these women were not supposed to engage in sexual activities. I really want to focus, though, on this would cause or would be used to cause distinction. I know the government wants to say it doesn't matter. We use these words interchangeably. I respectfully disagree. I think there's a huge difference. And I hope this court really looks upon this huge difference of would cause versus would be used to cause. Because if we just think about this, if we have to convict Mr. Collier, if he knows that forced fraud or coercion will cause these women to engage in sexual activity, that is different from if Mr. Collier knows that forced fraud or coercion will be used to cause these women to engage in sexual activity. One says he just simply has to know what could cause it. That's pretty easy to prove. It's a low burden. The other says we have to prove, the government has to prove, that he knows that this force or fraud or coercion will be used, it will be used, to cause these women. I really hope this court takes some time to look at this because to me it was a huge, huge distinction. And I think this case should be reversed on that alone. Thank you. Thank you, Mr. McKay. Case number 18-1025 is submitted for decision by the court. That concludes the court's docket and we will stand in recess until further call.